**FRIENDS OF THE EARTH, INC.; Citizens Local Environmental Action Network, Inc.; and Sierra Club, Plaintiffs,**

v.

**LAIDLAW ENVIRONMENTAL SERVICES (TOC), INC., Defendant.**

Civ. A No. 3:92–1697–17.

United States District Court, D. South Carolina, Columbia Division.

April 7, 1995.

Order Denying Reconsideration and Denying Certification of Question July 10, 1995.

Bruce J. Terris, Mark V. Dugan, Terris, Pravlik, & Wagner, Washington, DC, James Stuart Chandler, Jr., South Carolina Environmental Law Project, Pawleys Island, SC, Robert Guild, Columbia, SC, for plaintiffs.

Donald A. Cockrill, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, Michael S. Thwaites, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

## I. INTRODUCTION

Laidlaw Environmental Services (TOC), Inc. ("Laidlaw"), owns and operates a hazardous waste incinerator in Roebuck, South Carolina. As part of that facility, Laidlaw maintains a wastewater treatment plant for water used in the incineration process. Laidlaw discharges the treated wastewater into the North Tyger River pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit issued by the South Carolina Department of Health and Environmental Control ("DHEC").

Plaintiffs Friends of the Earth ("FOE") and Citizens Local Environmental Action Network, Inc. ("CLEAN") [1] brought this action on June 12, 1992 against Laidlaw pursuant to the citizen suit provision in section 505 of the Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, 33 U.S.C. § 1365. The Plaintiffs seek to enforce Laidlaw's NPDES permit and request declaratory and injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' fees and expert witness fees.

On July 1, 1992, the Defendant moved to dismiss the Plaintiffs' action, arguing that their citizen suit is barred by section 505(b)(1)(B) of the Act, 33 U.S.C. § 1365(b)(1)(B), because DHEC had previously brought, and settled, a lawsuit against Laidlaw for the same alleged violations of its permit. The Plaintiffs responded by arguing that DHEC's lawsuit did not preclude the citizen suit because, *inter alia*, DHEC did not "diligently prosecute" its action against Laidlaw. The court heard oral argument on the Defendant's motion to dismiss at the University of South Carolina School of Law on November 19, 1992.

In its order of December 14, 1992, the court denied the Defendant's motion to dismiss, but ruled that the determination of whether DHEC's action constituted diligent prosecution sufficient to bar the Plaintiffs' citizen suit involved disputed factual matters. Accordingly, the court decided to conduct a separate evidentiary hearing on the preliminary issue of whether the Plaintiffs' citizen suit could proceed. The court received a total of seven days of testimony on this matter in October, November, and December of 1993. Thereafter, the court requested the United States Department of Justice to file a brief as *amicus curiae* setting forth the position of the United States Environmental Protection Agency ("EPA") on the issues raised at the hearing. The Department of Justice submitted, on behalf of the United States, two *amicus* briefs that generally supported the Plaintiffs' position.

1. At the November 19, 1992 hearing in this action, the court granted the Plaintiffs' oral motion to join the Sierra Club as an additional plaintiff pursuant to Fed.R.Civ.P. 21.

After receiving all of the testimony, argument, and memoranda from the parties, as well as the submissions from the Department of Justice as *amicus curiae*, and after studying the applicable law, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II. FINDINGS OF FACT

### A. Parties

The Plaintiffs, FOE, CLEAN, and the Sierra Club, are non-profit corporations which bring this action on behalf of their members to protect their environmental, health, economic, recreational, and aesthetic interests in the quality of the North Tyger River and waters downstream.

The Defendant, Laidlaw, is a South Carolina corporation which owns and operates a hazardous waste incinerator (hereinafter "the facility") in Roebuck, Spartanburg County, South Carolina. As part of the facility, the Defendant operates a wastewater treatment plant to treat water used in the incineration process before discharging the wastewater into the North Tyger River.

### B. Chronology of Laidlaw's Operation of Roebuck Facility

The Defendant purchased the facility from ABCO Industries, Inc. ("ABCO") in January 1986. During most of 1986, after it purchased the facility from ABCO, Laidlaw did not have its own NPDES wastewater discharge permit; rather, Laidlaw operated the facility temporarily under the permit that had been issued to ABCO. On December 15, 1986, pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342, DHEC issued to Laidlaw NPDES permit number SC0040517, effective January 1, 1987, for the facility's wastewater treatment plant. The permit authorized the Defendant to discharge limited quantities of pollutants into the North Tyger River in accordance with the conditions set forth in the permit. The permit limited the Defendant's discharge of antimony, arsenic, cadmium, chromium, copper, lead, mercury, nickel, total organic carbon, and zinc. The permit also limited the flow, temperature, and pH of the effluent from the Defendant's facility. In addition, the permit imposed on the Defendant several monitoring and reporting obligations, such as the requirement to maintain discharge monitoring reports ("DMRs") and laboratory reports.

Several of the effluent limits in Laidlaw's initial permit were more stringent than those under ABCO's permit. The most significant reduction was in the mercury limit, which DHEC proposed to reduce from 20 parts per billion ("ppb") under ABCO's permit to 1.3 ppb. Because Laidlaw's permit contained such a dramatic reduction in the mercury limit, DHEC imposed an interim mercury limit of 10 ppb from January 1, 1987 to December 31, 1987, which decreased to 1.3 ppb on January 1, 1988.[2]

In connection with the interim mercury limit, the permit directed Laidlaw to conduct feasibility studies to determine whether the 1.3 ppb limit could be achieved. In addition, DHEC allowed Laidlaw the option of re-

---

**2.** On June 28, 1992, the Defendant applied for renewal of its NPDES permit. DHEC issued to the Defendant a draft permit on June 29, 1992 proposing to lower the Defendant's mercury limit to 1.1 ppb. According to the Defendant, DHEC recalculated the 1.1 ppb limit to 1.25 ppb after the Defendant requested a reduction in the wastewater flow rate from 220,000 gallons per day to 207,000 gallons per day. On September 1, 1993, DHEC renewed the Defendant's NPDES permit and imposed an adjusted mercury limitation of 1.25 ppb.

The parties have informed the court that the Defendant appealed the 1.25 ppb mercury limit in the renewed permit and that DHEC agreed to several revised permit conditions. Specifically, DHEC's revisions included changing the Defendant's 1.25 ppb mercury limit from a daily maximum to a monthly average maximum and raising the Defendant's maximum mercury limitation to 10 ppb. The Plaintiffs have informed the court that they have requested an administrative hearing regarding DHEC's modifications to the Defendant's NPDES permit. This order does not address the impact, if any, that the revised mercury limit would have on the merits of the Plaintiffs' lawsuit.

questing a higher, site-specific mercury limit upon completion of these feasibility studies.

Faced with a drastic reduction in the mercury limit, Laidlaw contracted with Environmental Technology Engineering, Inc. ("ETE"), an environmental consulting firm, in December 1986 to conduct an engineering feasibility study to determine the best technological approach to achieving the strict 1.3 ppb mercury limit. ETE initially evaluated eight possible technologies and narrowed the focus to two technologies—activated carbon and ion exchange—for bench and pilot scale testing. ETE tested these technologies between June and December 1987 and recommended the installation of a second carbon adsorption unit to be run in series with Laidlaw's existing carbon unit. When the Defendant's permit was issued in December 1986, the facility's wastewater treatment plant consisted of a neutralization system, a carbon adsorption filter, and a cooling system. In early 1988 the Defendant installed the second carbon adsorption unit. Because of ETE's recommendation that the second carbon unit should enable Laidlaw to meet the 1.3 ppb mercury limit, the Defendant chose not to exercise its option of requesting a higher mercury limit at that time.

Despite ETE's testing, the additional carbon unit did not allow the Defendant's facility consistently to achieve the 1.3 ppb mercury limit. The Defendant's continuing problem with mercury excursions came to a head in May 1988 after a fish kill on the North Tyger River downstream of Laidlaw's facility. DHEC investigated the incident and determined that the fish kill was caused by a pH upset at the Defendant's facility. Thereafter, DHEC initiated an administrative enforcement action, which culminated in a consent order with Laidlaw on September 7, 1988. The consent order required the Defendant to investigate treatment technologies that would enable it to comply with the pH limits in its permit. In addition, DHEC imposed on the Defendant a $20,000 penalty and required the Defendant to replace the killed fish.

In response to the September 1988 consent order, Laidlaw contracted with RMT, Inc., another environmental consulting firm, to re-evaluate the facility's wastewater treatment system and to make recommendations for correcting the problems Laidlaw was continuing to have with mercury and other metals excursions. During the latter part of 1988, RMT investigated four conceptual approaches to treating the effluent from the Defendant's facility. In December 1988, RMT submitted a preliminary engineering report to DHEC recommending the testing of three metals removal systems, trade named Unipure, Lancy, and Mem Tek, each of which employed a different technology for metals removal. During 1989, Laidlaw and RMT conducted bench and pilot scale tests on these three wastewater treatment systems.

Also during 1989, Laidlaw applied for and received approval from DHEC to replace its two existing cooling towers with a single, more advanced cooling system. The new cooling system was necessary to eliminate occasional temperature excursions that the Defendant experienced during the summer months.

On December 28, 1989, Laidlaw submitted to DHEC the results of RMT's pilot testing. These results showed that, among the three systems tested, the Lancy system was the most likely to achieve the Defendant's NPDES permit limits for all metals, including mercury. As a result, Laidlaw selected the Lancy system and requested approval from DHEC for its installation. DHEC approved the Defendant's request and issued a construction permit on July 10, 1990.

During the latter half of 1990 and the first two months of 1991 the Lancy system was constructed and installed at the Defendant's facility. Between February and July 1991, the Defendant began full scale operation of the Lancy system.

The Lancy system brought the Defendant into compliance with the non-mercury metals limits in the Defendant's permit. However, at least by April 1991, it was clear that the Lancy system would not enable the Defendant to comply with its mercury limit.

In responding to the continuing problems with mercury, the Defendant worked with DHEC and Lancy to make operational ad-

justments to the system in an effort to achieve compliance with the mercury limit. When it ultimately became apparent that mercury excursions were continuing to occur, the Defendant put pressure on the manufacturer of the Lancy system to correct the problem. Lancy responded by recommending numerous testing procedures, including the addition of varying amounts of iron sulfate, copper sulfate, and free sulfide. These tests were unsuccessful, however, in reducing the mercury content below the NPDES limit. Lancy thereafter determined that achieving the 1.3 ppb limit was problematic because it appeared that the level of metals being introduced to the wastewater treatment system was simply too low for the system to work effectively on mercury.

Because meeting the strict mercury limit continued to be problematic, on June 26, 1991, the Defendant filed with DHEC a request for a higher, site-specific limit for mercury. During the latter part of 1991, and continuing into the early part of 1992, Laidlaw both pursued its request for a higher mercury limit and continued to perform tests and otherwise investigate ways to achieve the 1.3 ppb limit. To support its request for a higher mercury limit, the Defendant commissioned a study of mercury levels in fish in the North Tyger River. DHEC found the Defendant's study to be inconclusive, however, and informed the Defendant that the study did not meet EPA criteria.

DHEC enforcement officials testified that they began to consider taking additional enforcement action in early 1992, after a series of abnormally high mercury violations at the Defendant's facility in December 1991. However, DHEC did not commence its enforcement action until May 1992.

On April 10, 1992, the Plaintiffs sent a letter to the Defendant, to the EPA, and to DHEC, informing them that the Plaintiffs intended to file a citizen suit against Laidlaw under section 505 of the Clean Water Act after sixty days, or on or after June 10, 1992.

DHEC initiated a formal enforcement action on May 21, 1992 by issuing to the Defendant a Notice of Enforcement Conference. The fact sheet attached to the Notice of Enforcement Conference stated that since April 1991 the Defendant had committed 225 violations of the mercury limit in its permit and two violations of the permit limit for antimony. DHEC was unaware of any violations of the Defendant's permit other than those set forth in the fact sheet. The violations set forth in the fact sheet were based on the monthly DMRs submitted by Laidlaw. DHEC was unaware of any violations of the monitoring or reporting requirements of the Defendant's permit.

On June 5, 1992, DHEC held an enforcement conference with the Defendant. Subsequent meetings and telephone conferences to negotiate a consent agreement occurred later in the day on June 5, 1992, as well as on June 8, 1992. The parties reached a final consent agreement on June 8, 1992. On June 9, 1992, the Defendant filed a judicial complaint in the Court of Common Pleas in Spartanburg County, South Carolina, on behalf of DHEC. On June 10, 1992, a state circuit judge approved the settlement of the DHEC lawsuit.

The Plaintiffs filed the instant lawsuit against Laidlaw on June 12, 1992. The Plaintiffs have compiled lists of the Defendant's alleged permit violations from the Defendant's DMRs and laboratory reports. The Plaintiffs allege that Laidlaw has had a long history of violations of its permit limits for metals and pH. According to the Plaintiffs, since the Defendant obtained its NPDES permit for the Roebuck facility it has committed at least 1,044 discharge violations, some of which allegedly continued until March 1993.

The Plaintiffs' lists of alleged violations show that the Defendant's most frequent violations have been of its limit for mercury. The Defendant's permit requires it to monitor for mercury every day that the incinerator is in operation. The Plaintiffs allege that the Defendant violated its mercury limit on almost a daily basis from early 1991 until June 18, 1992. The Plaintiffs also contend that the Defendant committed at least 31 discharge violations after the Consent Order with DHEC was entered. In addition, the Plaintiffs allege at least 676 violations of the permit's monitoring requirements and 615

violations of the permit's reporting requirements.

After the Consent Order with DHEC was entered, Laidlaw continued to explore additional technologies that might help to remedy the mercury problems. The Defendant experimented with various operational changes to the system and performed various tests utilizing chemicals and technologies both recommended by Laidlaw's consultants and developed internally by Laidlaw personnel. As the mercury problems continued to be investigated, the Defendant had to simply shut down the incinerator altogether for substantial periods of time in July, August, September, and November 1992, in an effort not to violate either its mercury parameter or the judicial consent order with DHEC.

The solution to meeting the 1.3 ppb limit was ultimately achieved by Laidlaw personnel through experimentation utilizing activated carbon, microfiltration, and ion exchange. The Defendant discovered that adding activated carbon filters at the end of the Lancy system effectively reduced the mercury level below 1.3 ppb, so long as the Defendant limited the feed rate of mercury-containing waste into the incinerator. The only problem encountered with this configuration occurred when the carbon adsorption filters were backwashed, as this procedure tended to release extremely fine particulates into the wastewater stream. Since any mercury-containing particulate would likely violate the 1.3 ppb limit, Laidlaw added both a microfilter and an ion resin exchange unit after the carbon filters to remedy this problem. The addition of the new equipment, combined with the Lancy system and the other components of the wastewater treatment system, has enabled the Defendant consistently to achieve full compliance with all of the parameters contained in its NPDES permit.

Following an extended period of demonstrated full compliance, DHEC agreed to allow the judicial consent order to expire. DHEC so notified the state court in a letter dated August 6, 1993 from DHEC attorney William Ready.

## C. DHEC's Judicial Enforcement Action

### 1. Decision to file judicial action

DHEC's original intent in prosecuting the Defendant for NPDES violations was to bring an administrative enforcement action against the Defendant. In fact, DHEC's usual approach in bringing a formal enforcement action is to issue a notice of enforcement conference and negotiate an administrative consent order. After receiving the Plaintiffs' sixty-day notice letter, however, Ralph Mellom, the Defendant's outside counsel, called Russell Sherer, Chief of DHEC's Bureau of Water Pollution Control, and inquired whether DHEC would consider filing an action in court against the Defendant. Sherer informed Mellom that DHEC had no interest in filing a judicial action instead of proceeding with an administrative action. Sherer stated, however, that DHEC would agree to file an action in court if the Defendant would expend any additional resources necessary to file a judicial action.

On June 5, 1992, following the DHEC enforcement conference, counsel for the Defendant telephoned DHEC and requested that the agency file a judicial action instead of proceeding with an administrative action. The Defendant's reason for requesting that DHEC file a judicial action was to bar the Plaintiffs' proposed citizen suit in federal court. DHEC does not normally file judicial actions to enforce NPDES permits. Indeed, Sherer testified that DHEC had filed judicial actions in only two cases prior to filing the judicial action against the Defendant and that, in each of the previous cases, the defendant had requested that a judicial action be filed. Earl Hunter, the Director of the Division of Water Quality Assessment and Enforcement in DHEC's Bureau of Water Pollution Control, testified that if the Plaintiffs had not sent a sixty-day notice letter, DHEC probably would not have filed a judicial action. Since DHEC must go to court to enforce either an administrative order or a judicial consent decree, DHEC gains no advantage by filing a judicial action instead of proceeding with an administrative action. DHEC filed a judicial action against the Defendant solely because counsel for the Defen-

dant requested that DHEC file a judicial action instead of an administrative action.

### 2. Procedural aspects of DHEC's judicial action

At the direction of Mellom, Phillip Connor, an associate with Mellom's law firm, drafted the initial version of the DHEC Complaint and of the Consent Order. On June 9, 1992, the sixtieth day after the Plaintiffs sent their sixty-day notice letter, Connor obtained the signatures from DHEC on the Complaint and Consent Order and signed the Consent Order for the Defendant. He then drove the Complaint and the Consent Order to the courthouse in Spartanburg, where he filed the Complaint and paid the filing fee for DHEC. He left the Consent Order in the judge's chambers, and the judge signed it the next day. The Consent Order was entered at 9:34 a.m. on June 10, 1992.

DHEC and the Defendant reached a settlement agreement pertaining to the DHEC lawsuit on Monday, June 8, 1992, just one business day after the initial enforcement conference. The time period from the enforcement conference to the final settlement agreement was, by DHEC's standards, "exceedingly fast." The usual time period from the date of the enforcement conference to the date of a consent order is thirty to forty-five days. Robert Knauss, the DHEC enforcement officer with responsibility for the Defendant's facility, testified that none of the cases in which he has been involved has moved as quickly to final settlement as DHEC's action against the Defendant. Similarly, William Krecker, the Section Manager of the Enforcement Division of DHEC's Bureau of Water Pollution Control, testified that, of the 100 to 200 enforcement cases he had been involved in, none has been resolved as quickly as DHEC's action against the Defendant. Hunter testified that the reason for the swiftness of the DHEC proceeding was the Defendant's request that DHEC file a judicial action and the deadline imposed by the Plaintiffs' sixty-day notice letter. Sherer testified in 1990, in another case, that citizen suits help bring about compliance and that DHEC's policy was not to file an action in court when requested to do so by a defen-

dant in order to bar a citizen suit. DHEC's action in this case violates this policy.

### 3. Substantive aspects of Consent Order

DHEC initially sought a penalty of $120,-000 from the Defendant. Knauss determined that DHEC would seek a penalty of $120,000, because that amount was consistent with past penalties obtained by DHEC. He testified that he determined in his head the amount of the penalty to seek from the Defendant and that he made no written record of how he arrived at the figure of $120,000. Both Hunter and Krecker approved the $120,000 penalty amount; however, neither of them personally involved himself in the computation of the penalty amount, each deferring to Knauss regarding the details of the penalty proposal. Hunter and Krecker also approved the $100,000 penalty ultimately included in the Consent Order.

DHEC's uniform enforcement policy, which was approved by the DHEC board in December 1991, sets forth several factors that may be considered in the assessment of civil penalties, including "[e]conomic benefit as a result of noncompliance." DHEC, Uniform Enforcement Policy, at 3, ¶ 3(d) (Dec. 12, 1991) (Pl.Ex. 10). In addition, DHEC's Bureau of Water Pollution Control has a guidance document that recommends a penalty of $1,000 for each discharge violation. DHEC Bureau of Water Pollution Control, Penalty Assessment Guidance, at 4 (Pl.Ex. 92). This amount may be adjusted upward or downward depending on various mitigating factors, such as mechanical problems, vendor problems, or inability to pay. *Id.* at 4–5. No evidence has been presented that any of these mitigating factors applied in this case. If a penalty of $1,000 per violation had been imposed in this case, the penalty based on the number of violations listed in the fact sheet accompanying DHEC's Notice of Enforcement Conference would have been $227,000.

In considering the seriousness of a permittee's violations, DHEC uses the standard of whether the violations were more than 1.4 times the permit limit. Knauss was aware that most of the Defendant's mercury violations were greater than 1.4 times its permit

limit for mercury. The DHEC penalty guidance and policy documents were available to enforcement staff at the time of the DHEC lawsuit.

DHEC made no attempt to calculate the Defendant's economic benefit from noncompliance. Krecker testified that he had no reason to believe that the Defendant had enjoyed any economic benefit and that economic benefit was not a factor in Knauss's consideration. Also, Hunter testified that Knauss considered, but did not calculate, economic benefit. However, no DHEC enforcement personnel obtained the information necessary to make an economic benefit calculation. DHEC did not determine the capital costs or the operation and maintenance costs of the wastewater treatment equipment installed by the Defendant. According to Krecker, DHEC does not normally make an economic benefit calculation in proceedings to enforce NPDES permits.

Hunter testified that DHEC considers economic benefit in conjunction with good-faith attempts at compliance and that "economic benefit is usually derived from someone that just ignores environmental laws and doesn't want to place equipment in place." In this case, although the Defendant had been in violation of its permit for five years by the time DHEC brought it enforcement action in 1992, Krecker testified that he did not consider the Defendant to have obtained any significant economic benefit because the Defendant installed pollution control equipment with the intent of being in compliance. Since DHEC believed that the Defendant was attempting in good faith to comply with its permit, DHEC did not deem economic benefit to be an important consideration in calculating a penalty against the Defendant.

On June 9, 1992, DHEC and the Defendant entered into a Consent Order in which the Defendant agreed to pay a penalty of $100,000. The Consent Order contains no injunction requiring the Defendant to comply with its permit, but requires only that the Defendant make "every effort" to comply. Consent Order and Decree, at 5, ¶ 10 (June 9, 1992) (Def.Ex. 167). Also, the Consent Order provides that "[t]he sums to be paid under the terms of this Consent Order shall constitute full settlement and shall completely discharge Defendant from any and all liability ... arising from ... (c) any and all violations occurring during the period covered by this Consent Order." Id. at 6, ¶ 14. The Consent Order further provides that it "shall automatically terminate and expire if and when Defendant achieves compliance with any new permit limit based on number 8 above or upon submittal of the additional plans, if necessary, and achieve[s] the limits for mercury referred to in paragraph 10 above." Id. at 6, ¶ 15.

Knauss testified that the Consent Order covered violations that occurred after the date it was entered. Krecker testified that DHEC's normal practice is that violations which occur after the date of a consent order are subject to additional enforcement action. He further testified that he is aware of only one case other than DHEC's case against the Defendant, in which DHEC's settlement covered future violations. In that case, however, the consent order provided for stipulated penalties for future violations. William Ready, DHEC's attorney who worked on this case, testified that it is not DHEC's practice to settle future violations "except on the basis of stipulated penalties." He also testified that DHEC attempted to include stipulated penalties in the Consent Order for permit violations that occurred after the Consent Order was entered, but did not insist them.

With the exception of Knauss, DHEC personnel testified that they did not interpret the Consent Order to cover permit violations that occurred after the date of the consent order. Ready testified that he believed that DHEC could seek penalties for violations occurring after the date of the Consent Order based on paragraph 10 of the Consent Order, which requires that the Defendant make "every effort" to comply with its mercury limit. However, Ready admitted that, if paragraphs 14 and 15 of the Consent Order were interpreted to settle violations occurring after the date of its entry but prior to its expiration, the Defendant would have obtained a benefit that is not extended to other dischargers in South Carolina.

The Consent Order also required the Defendant to complete a fish tissue study.

However, before the Consent Order was entered, the Defendant was already planning to conduct the fish tissue study to support its request for a higher mercury limit. DHEC had no interest in having the Defendant perform the fish tissue study.

All of the foregoing factors provide some evidence that DHEC did not diligently prosecute its action against Laidlaw.

### D. Economic Benefit of Noncompliance

The Defendant, as a holder of an NPDES discharge permit, should not profit from noncompliance with that permit. If DHEC assessed a penalty that was below the Defendant's economic benefit of noncompliance, DHEC would not have penalized the Defendant at all; instead, the Defendant would have been rewarded for noncompliance with its permit.

Economic benefit is the after-tax present value of avoided or delayed expenditures on necessary pollution control measures. Economic benefit represents the opportunity a polluter had to earn a return on funds that should have been spent to purchase, operate, and maintain appropriate pollution control devices. To determine a company's economic benefit from noncompliance with its permit, one must compare the company's cash flows associated with the delayed permit compliance measures to what those cash flows would have been if the company had obtained the necessary pollution control equipment on time.

EPA describes the nature of the economic benefit enjoyed by a firm that delays compliance with pollution control laws as follows:

An organization's decision to comply with environmental regulations usually implies a commitment of financial resources; both initially, in the form of a capital investment or one-time expenditure, and over time, in the form of annual, continuing expenses. These expenditures might result in better protection of public health or environmental quality; however, they are unlikely to yield any direct economic benefit (i.e., net gain) to the organization. If these financial resources were not used for compliance, they presumably would be invested in projects with an expected direct economic benefit to the organization. This concept of alternative investment; that is, the amount the violator would normally expect to make by not investing in pollution control, is the basis for calculating the economic benefit of noncompliance.

As part of the Civil Penalty Policy, EPA uses the Agency's penalty authority to remove or neutralize the economic incentive to violate environmental regulations. In the absence of enforcement and appropriate penalties, it is usually in the organization's best economic interest to delay the commitment of funds for compliance with environmental regulations and to avoid certain other associated costs, such as operating and maintenance expenses.

EPA, *BEN User's Manual* I–6 (July 1990) (Pl.Ex. 91).

Economic experts for both parties in this action testified that whether a permittee proceeded in good faith is irrelevant to economic benefit analysis. According to penalty guidelines promulgated by both the EPA and DHEC, good faith is a separate penalty factor to be considered when one determines what the appropriate civil penalty should be.

Present-value analysis of economic benefit allows one to express all cash flows as of a given date by accounting for the time value of money—*i.e.*, the fact that a dollar today is worth more than a dollar tomorrow. To determine by how much the value of a dollar of one year exceeds the value of a dollar of another year, one must use a discount rate to calculate the present value of money from the various time periods. The discount rate, or "opportunity cost," represents the return the Defendant had the opportunity to obtain by investing the funds it delayed or avoided spending on pollution control measures. This rate can be used to move dollars through time and determine the Defendant's economic benefit as of a given date.

The court adopts the capital-asset pricing model as the appropriate method for determining the Defendant's benefit of noncompliance. Under the capital-asset pricing model, the discount rate is computed by using a risk-free component, which is based on short-term United States Treasury Bills, and

a near-constant risk premium. Using the capital-asset pricing model, Dr. Michael Kavanaugh, the Plaintiffs' economic expert, determined that the appropriate discount rate for this case 15.25%.[3]

The court finds that the economic benefit the Defendant enjoyed by its failure to make timely expenditures for pollution control equipment is substantially in excess of the $100,000 penalty amount as of July 1, 1992, the approximate date of the Defendant's penalty payment to DHEC. Although the court accepts Dr. Kavanaugh's methodology of using the capital-asset pricing model to determine a violator's economic benefit of noncompliance, the court declines, at this time, to make a specific finding on the precise amount of the Defendant's economic benefit.

The court's preliminary determination that the penalty imposed by DHEC in the June 9, 1992 Consent Order failed to recover the Defendant's economic benefit of noncompliance is based on the following delayed or avoided expenditures.

### 1. Neutralization and pH control equipment

The neutralization and pH control equipment that the Defendant had in 1987 was inadequate, according to both Dr. Bruce A. Bell, the Plaintiffs' wastewater treatment expert, and Dr. Thomas Keinath, the Defendant's wastewater treatment expert. By late 1988, the Defendant had replaced its neutralization system with adequate neutralization tanks, a pH control system, and freeze protection.[4] The neutralization and pH control system that the Defendant installed was necessary for it to comply with both the metals and pH limits in its permit that became effective on January 1, 1987. This system is necessary for compliance with the metals limits because the removal of metals is dependent on adequately controlling the pH levels in the wastewater. As Dr. Bell testified, the technology for neutralization and pH control has been available at least since the 1960s. Therefore, the court finds that the changes the Defendant made to its neutralization system in 1988 should have been made in time to comply with its metals and pH permit limits that went into effect on January 1, 1987.

### 2. Lancy system

Dr. Keinath testified that the dual carbon filter system that the Defendant had in place prior to 1991 did not enable the Defendant to comply with the metals limits in its permit. Dr. Keinath further testified that some metals which are regulated in the Defendant's permit, such as arsenic and antimony, are not easily removed with carbon treatment.

As noted earlier, the Defendant decided in late 1989 or early 1990 to install the Lancy system. The Defendant began operating the Lancy system in March 1991.

The Lancy system consists of equalization, neutralization, sulfide addition, a retention tank, an adsorption filter, and final pH control. According to both Dr. Keinath and Dr. Bell, the Lancy system consists entirely of technology that was available prior to 1987.

---

3. Dr. Kavanaugh also calculated the Defendant's economic benefit using two alternative discount rates. First, Dr. Kavanaugh performed the calculation using 18.1% as the discount rate. This was the rate that EPA used at the time of DHEC's lawsuit against Laidlaw in June 1992. Naturally, if the 18.1% discount rate were used for the economic benefit calculation, the Defendant's economic benefit as of the July 1992 penalty payment date would be significantly larger than that calculated using the 15.25% rate.

Second, Dr. Kavanaugh performed the economic benefit calculation using 11.9% as the discount rate. This is the rate that the EPA currently recommends. The 11.9% discount rate is based on a national average for a company's weighted average cost of capital, or WACC. WACC is a method of determining the cost of capital to a company by combining the debt cost of capital and equity cost of capital and weighing those costs based on the proportion of debt and equity in a company's financial structure. WACC is therefore not based on the return an investor could have earned on funds not spent on pollution control, but is a based on the cost of obtaining the money. Since the point of removing economic benefit is to remove the earnings that could be obtained by the discharger by not investing in the actions needed for permit compliance, an equity rate, such as the 15.25% rate used by Dr. Kavanaugh, is preferable to a WACC rate.

4. The pH system consists of equipment that automatically controls the dose of caustic soda to regulate the pH level in the Defendant's wastewater.

Dr. Bell testified that the Lancy system has been commercially available since at least 1984. Dr. Keinath testified that, according to the 1985 text, *Industrial Wastewater Treatment Technology* by Dr. James Patterson, the technologies available for treatment of mercury in 1985 were carbon adsorption and ion exchange. However, Dr. Patterson's chapter on mercury removal lists several technologies other than carbon adsorption and ion exchange that were available for mercury removal in 1985. The first technology that Dr. Patterson notes as being available for mercury removal is sulfide addition, which, he writes, can be combined with filtration. Sulfide addition and filtration are the basic technologies underlying the Lancy system. In addition, Dr. Keinath testified that he believed that the Lancy system was unproven technology for mercury removal in 1987. In fact, as both Dr. Keinath and Dr. Bell testified, the Lancy system was unable by itself to remove enough mercury to allow the Defendant to meet the 1.3 ppb mercury limit. However, Dr. Keinath also testified that the Lancy system "could well have been utilized" in 1987 for treatment of metals other than mercury. Dr. Keinath further testified that the Lancy system had in fact been installed by other dischargers before the Defendant installed the Lancy system.

The court recognizes that the Lancy system was not available for off-the-shelf purchase in 1986, nor is it currently available for off-the-shelf purchase; rather, the Lancy system consists of technology which must be engineered and manufactured specifically for the purchaser. Nevertheless, according to both Dr. Keinath and Dr. Bell, the Lancy system or its functional equivalent was necessary for the Defendant to comply with the non-mercury metals limits in its permit that went into effect on January 1, 1987. The Lancy system or its functional equivalent also would have enabled the Defendant to comply with the 10 ppb mercury limit that was in effect from January 1, 1987 to December 31, 1987. Therefore, the court finds that the Defendant should have installed the Lancy system or its equivalent by January 1, 1987.

### 3. Additional mercury-removal equipment

As noted previously, the Lancy system brought the Defendant into compliance with the non-mercury metals limits in its permit, but was unable to achieve the 1.3 ppb mercury limit. In 1992 and 1993, the Defendant installed additional equipment, including carbon adsorption equipment, prefilters, ion exchange equipment, and microfiltration, to remove mercury from its wastewater. In July 1992, the Defendant installed new carbon adsorption equipment. Also, in January 1993, the Defendant installed prefilters, which are necessary to protect the carbon adsorption equipment. Finally, in April 1993, the Defendant installed ion exchange equipment, as well as microfiltration equipment to remove small particulate mercury formed during the sulfide precipitation process in the Lancy system.

Dr. Keinath testified that he believes that the Defendant could comply with its permit with only the Lancy system and microfiltration and that the carbon adsorption filters and ion exchange equipment that the Defendant installed were "redundancies." However, Dr. Keinath also testified that both carbon adsorption and ion exchange equipment remove some mercury, that the Defendant's mercury violations continued until after this equipment was in place, and that he was uncertain whether the Defendant could actually comply with its permit without the carbon adsorption and ion exchange equipment.

When the Defendant applied for a permit to construct activated carbon equipment, it stated that such equipment would "further reduce mercury concentrations to below 1.3 ppb in the wastewater discharge." The Defendant's activated carbon equipment in fact worked well to remove mercury from the Defendant's wastewater. Furthermore, when the Defendant applied for a permit to construct ion exchange equipment, it stated that, in conjunction with microfiltration, such equipment "will ensure compliance" with the Defendant's mercury limit. The Defendant's ion exchange equipment also worked well to remove mercury from the Defendant's wastewater.

The carbon adsorption filters and ion exchange equipment are designed to remove soluble mercury from the Defendant's wastewater. A test conducted by the Defendant on actual effluent from the Lancy system showed that soluble mercury in concentrations greater than the Defendant's permit limit for mercury sometimes passes through both the Lancy system and the microfiltration equipment. The carbon adsorption and ion exchange equipment are therefore necessary to enable the Defendant to comply with its permit limit for mercury.

All of the mercury removal equipment that the Defendant installed in 1992 and 1993 was necessary to ensure the Defendant's compliance with the 1.3 ppb mercury limit. All of this mercury removal technology was commercially available before the Defendant purchased the facility in 1986. Therefore, the court finds that the Defendant should have installed the additional mercury removal equipment by January 1, 1988, in order to satisfy the mercury limit in its permit.

In summary, to comply with its permit the Defendant should have installed by January 1, 1987 all of the equipment that is currently in place, or its functional equivalent, with the exception of the equipment that was designed specifically for mercury removal. The Defendant should have installed the remaining mercury removal equipment, or its functional equivalent, by January 1, 1988.

The Defendant realized a significant economic benefit by taking seven years to achieve compliance with its NPDES permit limits. Although Dr. Keinath testified that the each of the individual wastewater treatment measures undertaken by the Defendant was logical, the Defendant profited by operating its facility for seven years despite continuing permit violations. In other words, the Defendant is better off now, even after paying the $100,000 penalty, than it would have been had it made the expenditures necessary to comply with its permit in a timely fashion or had it simply shut down the facility until compliance were possible.

## III. CONCLUSIONS OF LAW

Congress enacted the Clean Water Act ("CWA" or "the Act") in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve the stated goals of the Act, section 301(a) makes unlawful the discharge of any pollutant into any navigable waters, except as specifically authorized by certain enumerated sections of the Act. 33 U.S.C. § 1311(a).

One of these exceptions is section 402, 33 U.S.C. § 1342, which establishes the National Pollutant Discharge Elimination System ("NPDES"). Pursuant to section 402(a), or pursuant to a state program authorized under section 402(b), the appropriate regulatory authority may issue permits that allow the holder to discharge pollutants in accordance with the conditions and limitations set forth in the permit.[5]

The holder of an NPDES permit who fails to comply with the conditions of its permit may be subject to administrative, civil, or criminal sanctions. 33 U.S.C. § 1319. Permits issued under a state NPDES program are subject to both federal and state enforcement actions. *See id.;* 33 U.S.C. § 1342(b)(7). In addition, section 505 of the CWA authorizes private citizens, under certain circumstances, to bring civil actions to enforce any effluent standard or limitation

5. Section 402(a) grants to the Administrator of the EPA the authority to issue permits for the discharge of pollutants in accordance with the conditions, as set forth in each permit, that the Administrator determines are necessary to carry out the provisions of the CWA. 33 U.S.C. § 1342(a). Section 402(b) authorizes each state to establish and administer its own NPDES program, subject to the approval and continued monitoring of the Administrator, for navigable waters within the state's jurisdiction. 33 U.S.C. § 1342(b). After a state's NPDES program receives approval under section 402(b), the Administrator suspends the issuance of federal NPDES permits as to the navigable waters subject to the state program, unless the Administrator determines that the state program fails to conform to the guidelines established pursuant to the Act. 33 U.S.C. § 1342(c)(1).

South Carolina has established its own NPDES program pursuant to section 402(b). On June 10, 1975, the Administrator of the EPA delegated to DHEC the responsibility for administering the NPDES program in South Carolina. *See* 57 Fed. Reg. 43,734 (Sept. 22, 1992).

under the Act, including NPDES permits. 33 U.S.C. § 1365(a)(1).

Section 505(b)(1) provides two significant limitations on a citizen's right to bring a citizen enforcement suit under the CWA.[6] First, under section 505(b)(1)(A), the citizen must provide notice of the alleged violation to the Administrator of the EPA, to the state enforcement agency of the state in which the alleged violation occurs, and to the alleged violator at least sixty days before the citizen may file a citizen suit. 33 U.S.C. § 1365(b)(1)(A). Second, section 505(b)(1)(B) provides that no citizen suit may be commenced "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with [the same NPDES permit]." 33 U.S.C. § 1365(b)(1)(B).

In the matter currently before the court, the Defendant contends that section 505(b)(1)(B) precludes the Plaintiffs' lawsuit because, it argues, DHEC "diligently prosecut[ed]" an enforcement action against Laidlaw in South Carolina state court on June 9, 1992, which action was settled by judicial consent order on June 10, 1992.

■ The Plaintiffs raise several arguments in opposition to the Defendant's contention that their citizen suit is barred under section 505(b)(1)(B) by DHEC's lawsuit against the Defendant. The Plaintiffs initially argue that section 505(b)(1)(B) bars the commencement of a citizen suit only while a state or federal enforcement action is pending, but not after that action has been concluded. In other words, the Plaintiffs urge the court to interpret section 505(b)(1)(B) only to prohibit citizen suits and federal or state enforcement suits from proceeding simultaneously. The Plaintiffs assert that sec-

tion 505(b)(1)(B) does not bar their action because DHEC's action against Laidlaw in June 1992 was settled before the Plaintiffs filed their suit. The Plaintiffs base their argument on a plain reading of section 505(b)(1)(B), which provides that no citizen suit may be commenced if the enforcement agency "has commenced and *is diligently prosecuting* " a judicial action against the alleged violator. 33 U.S.C. § 1365(b)(1)(B) (emphasis added).

Section 505(b)(1)(B) obviously contemplates a situation in which a citizen proposes to file a private enforcement suit contemporaneously with an ongoing governmental enforcement suit. Indeed, as one district court recognized, "the purpose underlying the 'diligent prosecution' provision [is] that a defendant not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standard." *Connecticut Fund for the Environment v. Contract Plating Co.*, 631 F.Supp. 1291, 1293 (D.Conn.1986). Moreover, the provision in section 505(b)(1)(B) that allows any citizen to intervene as of right in any enforcement action brought in federal court clearly envisions the governmental action pending at the time of the attempted citizen suit. However, it is doubtful that Congress intended the preclusive effect of section 505(b)(1)(B) to expire once the government has concluded its diligent prosecution of a particular violator.

■ As the Defendant observed in response to the Plaintiffs' argument, reading section 505(b)(1)(B) only in the present tense would allow citizens to bring a private enforcement action against any alleged violator, as long as the citizen waited until the conclusion of the governmental action before bringing the citizen suit.[7] Such a result would be contrary to the United States Supreme

---

6. In addition, as provided by section 505(a), 33 U.S.C. § 1365(a), citizen suits may also be limited by section 309(g)(6), 33 U.S.C. § 1319(g)(6). However, the Defendant has not asserted that any of the provisions of section 309(g)(6) apply to this case.

7. The court has contemplated that perhaps the concern about potentially duplicative citizen suits could be addressed by the common-law principle of *res judicata*. For example, if a state enforcement agency is deemed to represent all of

the state's citizens as *parens patriae*, then any judicial enforcement actions it resolves, either through settlement or judgment, might be binding on the citizens of the state through traditional principles of claim preclusion. *See, e.g., United States EPA v. City of Green Forest, Ark.*, 921 F.2d 1394, 1404 (8th Cir.1990) (holding that " 'once a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding upon their

Court's declaration in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), that "citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Id.* at 60, 108 S.Ct. at 383 (quoting S.Rep. No. 414, 92d Cong., 1st Sess. 64 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730). Thus, although the "diligent prosecution" condition in section 505(b)(1)(B) is phrased in the present tense, the court has determined that Congress intended to prohibit citizen suits where the governmental enforcement agency is diligently prosecuting or has dili-

gently prosecuted a judicial action to enforce the same alleged violations of a particular permit, standard, or limitation.

■■■ Therefore, the critical issue presently before the court is whether DHEC's June 9, 1992 lawsuit against Laidlaw constitutes diligent prosecution sufficient under section 505(b)(1)(B) to bar the Plaintiffs' citizen suit. This inquiry is guided by several principles that have been developed in the caselaw interpreting the citizen-suit provisions of the CWA.[8]

■■ First, the citizen-plaintiffs bear the burden of proving that the state agency's

---

rights'") (quoting *United States v. Olin Corp.*, 606 F.Supp. 1301, 1304 (N.D.Ala.1985)), *cert. denied*, 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991). Because this issue was not examined at the hearing or in the memoranda of the parties, the court invited both parties to submit supplemental briefs on this issue.

In response, the Plaintiffs assert that the CWA preempts common-law principles of *res judicata* because section 505(a) specifically provides that citizen suits may be brought "[e]xcept as provided in subsection (b) of this section and section 309(g)(6)." 33 U.S.C. § 1365(a). The Plaintiffs argue that because Congress explicitly stated that citizen suits can be brought in all other situations, no other limitations, including *res judicata*, apply to citizen suits.

Furthermore, the Plaintiffs argue that a state enforcement action would not preclude, under *res judicata*, a subsequent citizen suit because the two actions would not involve identical parties or their privies. Identity of parties is generally one of the required elements of *res judicata*. *See Nash County Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir.), *cert. denied*, 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981). The Plaintiffs recognize that, in a *parens patriae* action, a state represents all of its citizens so that a state action can bar a subsequent, identical action brought by a citizen of the state. *See New Jersey v. New York*, 345 U.S. 369, 372–73, 73 S.Ct. 689, 690–91, 97 L.Ed. 1081 (1953). However, the Plaintiffs argue that in granting citizens the rights to enforce the CWA, Congress recognized that governmental enforcement agencies may not adequately represent the interests of their citizens. Therefore, argue the Plaintiffs, Congress did not intend for citizen suits under the CWA to be restricted by the *parens patriae* doctrine.

The Defendant also argues against the application of *res judicata* in a situation such as that presently at bar. The Defendant primarily asserts that *res judicata* would not apply because there would be no identity of parties between a state enforcement suit and a subsequent citizen suit.

This court need not resolve whether the doctrine of *res judicata* would apply to bar a CWA citizen suit after a governmental enforcement action has been concluded. Generally, *res judicata* is an affirmative defense, which must be specifically pleaded or else it is deemed to be waived. Fed.R.Civ.P. 8(c); *see Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir.1990), *cert. denied*, 502 U.S. 815, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991). Because the Defendant has not raised *res judicata* as a defense in this action, this issue is not before the court.

8. The issue of diligent prosecution under section 505(b)(1)(B) of the CWA is a federal standard, not a state-law standard as the Defendant asserts. When there is a question concerning what law governs a claim, "it is the *source* of the right sued upon ... which determines the governing law." *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956); *see also* 19 Charles A. Wright et al., Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4515 (1982). When an issue arises under a comprehensive federal statute such as the CWA, that issue should be decided according to federal law. *See PIRG v. Top Notch Metal Finishing Co.*, 29 Env't Rep. Cas. (BNA) 1022, 1028, 1988 WL 156725 (D.N.J.1988) (holding in Clean Water Act case that federal law should be used to decide issue of piercing of corporate veil).

The Defendant's reliance on *United States v. T & S Brass & Bronze Works, Inc.*, 28 Env't Rep. Cas. (BNA) 1649, 1988 WL 138665 (4th Cir. 1988), to argue that the court should not impose on a state program a federal standard of diligent prosecution is misplaced. The court in the *T & S Brass* case merely held that state regulations, not federal regulations, govern the closure and post-closure activities of hazardous waste facilities where the federal government has given the state the authority to operate its own regulatory scheme for hazardous wastes in lieu of the federal program. *Id.* at 1650–51. The *T & S Brass* court did not address the standards governing federal enforcement of those regulations.

prosecution was not diligent. This burden is a heavy one because diligence on the part of the enforcement agency is presumed. *See Connecticut Fund for the Environment v. Contract Plating Co.,* 631 F.Supp. at 1293. As several courts have recognized, "the state [enforcement] agency must be given great deference to proceed in a manner it considers in the best interests of all parties involved." *Arkansas Wildlife Fed'n v. ICI Americas Inc.,* 842 F.Supp. 1140, 1147 (E.D.Ark.1993), *aff'd,* 29 F.3d 376 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995).

■ Deference to governmental enforcement agencies is appropriate because the CWA delegates the primary enforcement responsibility to designated state and federal agencies. For example, the requirement in section 505(b)(1)(A) that a citizen must file a notice letter sixty days before bringing a private enforcement suit clearly was designed to give the governmental agencies the "first shot" at enforcement. As the Supreme Court stated in *Gwaltney,* "the citizen suit is meant to supplement rather than to supplant governmental action." 484 U.S. at 60, 108 S.Ct. at 383. Appropriate limitations on citizen suits generally "allow for smoother operation of ordinary enforcement mechanisms" and encourage out-of-court settlements between agencies and polluters. *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 777 F.Supp. 173, 179, 186 (D.Conn. 1991), *aff'd in part, rev'd in part,* 989 F.2d 1305 (2d Cir.1993); *cf. Supporters To Oppose Pollution, Inc. v. Heritage Group,* 973 F.2d 1320, 1324 (7th Cir.1992) (in action under the Resource Conservation and Recovery Act (RCRA), stating: "An Administrator unable to make concessions is unable to obtain them. A private plaintiff waiting in the wings then is the captain of the litigation.... To say ... that the EPA is not 'diligently prosecuting' the action if it does not sue the person, or use the theories, the plaintiff prefers

would strip EPA of the control the statute provides.").

On the other hand, Congress certainly intended to provide private citizens with significant opportunities to participate in the enforcement of the CWA. *See* S.Rep. No. 414, *supra,* at 72, *reprinted in* 1972 U.S.C.C.A.N. at 3738 ("An essential element in any control program involving the nation's waters is public participation. The public must have a genuine opportunity to speak on the issue of protection of its waters.... The scrutiny of the public ... is extremely important in insuring expeditious implementation of the authority and a high level of performance by all levels of government and discharge sources."). As the United States Court of Appeals for the Second Circuit stated, " 'Congress made clear that citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests.' " *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 63 (2d Cir.1985) (quoting *Friends of the Earth v. Carey,* 535 F.2d 165, 172 (2d Cir.1976) (referring to citizen suit provision of the Clean Air Act[9])). In addition to authorizing citizen suits under section 505, the CWA provides several opportunities for citizens to participate in governmental enforcement activities. Indeed, as noted previously, the last phrase of section 505(b)(1)(B) provides that if a citizen suit is barred by the EPA's or the state's diligent prosecution of a judicial action, "in any such action in a court of the United States any citizen may intervene as a matter of right."[10] 33 U.S.C. § 1365(b)(1)(B).

Also, section 309(g) contains provisions for public participation in administrative actions brought by the EPA. Section 309(g)(4)(A) requires the EPA to provide public notice of and reasonable opportunity to comment on the proposed issuance of any order assessing civil administrative penalties under section 309(g). 33 U.S.C. § 1319(g)(4)(A). In addi-

9. The citizen-suit provision in the CWA was modeled after the provision in the Clean Air Act. S.Rep. No. 414, *supra,* at 79, *reprinted in* 1972 U.S.C.C.A.N. at 3745.

10. Apparently Congress limited intervention of right under section 505(b)(1)(B) to cases in feder-

al court because, under general principles of federalism and state sovereignty, Congress likely would have no authority directly to provide citizens the right to intervene in state-court enforcement actions.

tion, section 309(g)(4)(B) provides that anyone who comments on the proposed assessment of an administrative penalty shall be notified of the hearing and "shall have a reasonable opportunity to be heard and to present evidence." 33 U.S.C. § 1319(g)(4)(B). Any person who comments on the proposed assessment of civil penalties may obtain judicial review of such assessment. 33 U.S.C. § 1319(g)(8).

Moreover, the federal regulations that list the requirements for state enforcement authorities administering NPDES programs provide, in part:

Any State administering [an NPDES] program shall provide for public participation in the State enforcement process by providing either:

(1) Authority which allows intervention as of right in any civil or administrative action to obtain remedies specified in paragraphs (a)(1), (2) or (3) of this section by any citizen having an interest which is or may be adversely affected; [11] or

(2) Assurance that the State agency or enforcement authority will:

(i) Investigate and provide written responses to all citizen complaints submitted pursuant to the procedures specified in § 123.26(b)(4);

(ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; [12] and

(iii) Publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action.

40 C.F.R. § 123.27(d).[13]

In addition, the importance of public participation in the enforcement of the CWA has been recognized by several courts interpreting section 309(g)(6)(A). That section provides, in part, that "any ... violation with respect to which a State has commenced and is diligently prosecuting an action under State law comparable to this subsection ... shall not be the subject of a civil penalty action under [section 1319(d) ... or section 1365 of this title [the citizen suit provision]." 33 U.S.C. § 1319(g)(6)(A). One issue that has repeatedly arisen in citizen suit litigation is whether a state's scheme for administrative enforcement actions is "comparable to" the federal provisions, sufficient under section 309(g)(6)(A) to preclude a citizen suit. In making this determination, courts often focus on whether the state's enforcement mechanisms contain provisions to ensure adequate participation by private individuals in administrative enforcement actions. *See, e.g., Arkansas Wildlife Fed'n v. ICI Americas, Inc.* 29 F.3d 376, 381 (8th Cir.1994) (holding that, to be comparable to federal law for purposes of section 309(g)(6)(A), state law must "provide[] interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguard[] their legitimate substantive interests"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995); *North & South Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552, 556 n. 7 (1st Cir.1991) ("So long as the provisions in the State Act adequately safeguard the substantive interests of citizens in enforcement actions, the rights of notice and public participation found in the State Act are satisfactorily comparable to those found in the Federal Act."); *Atlantic States Legal Found. v. Universal Tool & Stamping Co.,* 735 F.Supp. 1404, 1415 (N.D.Ind.1990) (" '[I]n order to be comparable, a State law *must* provide for a right to a hearing and for public notice and

---

**11.** The South Carolina Rules of Civil Procedure contain a provision for intervention of right. Rule 24(a) provides:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair his ability to pro-

tect that interest, unless the applicant's interest is adequately represented by existing parties. S.C.R.Civ.P. 24(a).

**12.** The South Carolina rules also allow for permissive intervention. *See* S.C.R.Civ.P. 24(b).

**13.** Under these regulations, "Any State program approved by the Administrator shall at all times be conducted in accordance with the requirements of [Part 123, which is entitled, 'State Program Requirements']." 40 C.F.R. § 123.1(f).

participation procedures similar to those set forth in section 309(g)....'") (quoting 133 Cong.Rec. S737 (daily ed., Jan. 14, 1987)).

Thus, the issue presently before the court involves a delicate balance between the Act's preference for governmental enforcement efforts and the recognized policy of allowing private citizens to participate in the enforcement process. Of course, the overriding concern is to assure vigorous enforcement of the CWA to achieve the stated goals of the Act.

■ The Plaintiffs argue that DHEC's prosecution of Laidlaw in June 1992 was not sufficiently diligent under section 505(b)(1)(B) to preclude their citizen suit. The Plaintiffs challenge both the procedural aspects of the DHEC lawsuit and also the substance of the settlement agreement. In determining whether DHEC's lawsuit against Laidlaw was diligently prosecuted, the court will analyze the Plaintiffs' allegation of lack of diligence "against the background of the agency action." S.Rep. No. 414, *supra*, at 80, *reprinted in* 1972 U.S.C.C.A.N. at 3746; *see also SPIRG v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1535 (D.N.J.1984) ("An evaluation of 'diligence' measures comprehensively the process and effects of agency prosecution."), *aff'd on other grounds*, 759 F.2d 1131 (3d Cir.1985).

■ The Plaintiffs allege several procedural defects to support their claim that the DHEC action should not preclude their citizen suit. First, DHEC filed its complaint and consent order in state court on the very last day of the statutory sixty-day notice period during which it was possible under section 505(b) for a state-court action to preclude a citizen suit. Second, the complaint was filed at the Defendant's request, solely to accommodate the Defendant's desire to bar a citizen suit. The Plaintiffs contend that the judicial action served no purpose of DHEC beyond that provided by the usual administrative enforcement action. Third, Laidlaw drafted the state-court complaint and settlement agreement, filed the lawsuit against itself, and paid the filing fee. And finally, the settlement agreement between DHEC and Laidlaw was entered into with unusual haste, without giving the Plaintiffs the opportunity to intervene.

■ Although the procedural aspects of DHEC's June 9, 1992 action against the Defendant are somewhat suspect, they do not, in and of themselves, establish a lack of diligent prosecution.[14] *Cf. Atlantic States Legal Found. v. Universal Tool & Stamping Co.*, 735 F.Supp. at 1416 (finding that state's prosecution was not diligent because, *inter alia*, counsel for the defendant "walked through" the interlocutory consent decree for approval in the offices of the state agency in a single day; procedure was highly unusual as the approval and signing of such decrees usually requires four to six weeks). The court is quite concerned, however, that because DHEC settled its action against Laidlaw only one day after the lawsuit was filed, the Plaintiffs simply had no chance to intervene. *See Love v. New York State Dep't of Envtl. Conservation*, 529 F.Supp. 832, 843–44 (S.D.N.Y.1981) (in holding that state failed to diligently prosecute an administrative action, the court cited, *inter alia*, the lack of oppor-

---

**14.** The Plaintiffs argue that DHEC's action against Laidlaw was collusive and, therefore, that the lawsuit should have no preclusive effect under section 505(b)(1)(B). The Plaintiffs analogize the preclusive effect of section 505(b)(1)(B) to that of *res judicata*. As the Plaintiffs observe, a collusive action has no preclusive effect under *res judicata*. *See Morris v. Jones*, 329 U.S. 545, 550–51, 67 S.Ct. 451, 455, 91 L.Ed. 488 (1947) ("'A judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata, in the absence of fraud or collusion....'") (quoting *Riehle v. Margolies*, 279 U.S. 218, 225, 49 S.Ct. 310, 313, 73 L.Ed. 669 (1929)). To support their claim of collusion, the Plaintiffs cite the following definition of the term "collusive action":

> An action not founded on an actual controversy between the parties to it, but brought for [the] purpose of securing a determination of a point of law for the gratification of curiosity or to settle rights of third persons not parties. Such actions will not be entertained for the courts will decide only "cases or controversies."

*Black's Law Dictionary* 265 (6th ed. 1990) (citing *City & County of San Francisco v. Boyd*, 22 Cal.2d 685, 140 P.2d 666, 669, 670 (1943)).

The court does not find that the action between DHEC and Laidlaw in June 1992 was the product of fraud or collusion between the parties. Such a finding does not, however, mean that DHEC's action was diligent prosecution for purposes of section 505(b)(1)(B).

tunity for the citizen plaintiffs to intervene); *Sierra Club v. SCM Corp.*, 572 F.Supp. 828, 830–31 (W.D.N.Y.1983) (holding that "where settlement of permit violations is achieved as a result of enforcement proceedings in which plaintiffs, as members of the public, lacked the opportunity to be heard on the merits of the proposed consent order, a citizens suit pursuant to 33 U.S.C. Section 1365(a)(1) may properly be entertained by a federal district court"). Because of the importance of public participation in the enforcement processes of the CWA, as discussed above, the absence of a meaningful opportunity for the citizen plaintiffs to intervene in this case triggers a heightened scrutiny into the settlement of the underlying case between DHEC and Laidlaw. In examining the totality of the circumstances surrounding DHEC's prosecution of Laidlaw, the court is compelled to conclude that this procedural deficiency weighs in favor of the Plaintiffs.

█ The Plaintiffs also contend that the substantive provisions of the Consent Order between DHEC and Laidlaw demonstrate that DHEC's state-court action was not diligently prosecuted. The Plaintiffs identify several aspects of the Consent Order that they allege demonstrate a lack of diligence on the part of DHEC. First, the Consent Order did not provide that the court's jurisdiction would continue in order to enforce the decree, but only that the Defendant's violations of the order's terms would subject it to "additional enforcement action." Consent Order and Decree, at 5, ¶ 13 (June 9, 1992) (Def.Ex. 167). The Consent Order also provides that DHEC's complaint be dismissed. *Id.* at 4, ¶ 1. In addition, DHEC did not obtain an injunction requiring the Defendant to comply with its permit; instead, the Consent Order merely required the Defendant to "use every effort" to comply with its mercury limit. *Id.* at 5, ¶ 10. Furthermore, the Consent Order did not contain stipulated penalties for future violations of the Defendant's permit. The Consent Order provides:

> This Consent Order constitutes a full, fair, reasonable, and complete settlement of the allegations contained in the complaint filed in this case, and all other claims covered by this Consent Order, *in-cluding all claims Plaintiff [DHEC] might have arising out of or in any way connected with alleged violations of NPDES Permit No. SC0040517.*

*Id.* at 4, ¶ 4 (emphasis added). The Consent Order further provides that the Defendant will be discharged from liability for "any and all violations occurring during the period covered by this Consent Order." *Id.* at 6, ¶ 14. Finally, the Consent Order extended for an indefinite period into the future, until the Defendant demonstrated compliance with the mercury limitation of its permit. *Id.* at 6, ¶ 15.

█ The mere fact that a settlement reached by the state is less burdensome to the defendant than the remedy sought in the complaint in the citizen suit does not establish that the state failed to prosecute its action diligently. *See Connecticut Fund for the Environment v. Contract Plating Co.*, 631 F.Supp. at 1294. However, the lack of substantial relief in a settlement is properly considered by the court in determining whether the state action was diligently prosecuted. *See New York Coastal Fishermen's Ass'n v. Department of Sanitation*, 772 F.Supp. 162, 168 (S.D.N.Y.1991) (holding that the state's prosecution was not diligent because it allowed permit compliance to be delayed and because the state agency had acted "as a pen pal, not a prosecutor"); *Atlantic States Legal Found. v. Universal Tool & Stamping Co.*, 735 F.Supp. at 1416 (finding that state's enforcement activities did not constitute diligent prosecution because the state's administrative proceeding had little effect upon the defendant's efforts to comply with its permit and because the state assessed a lenient penalty of only $10,000 for hundreds of violations, which were susceptible of a $25,000 penalty per violation). In addition, a state's failure to enforce its consent order constitutes some evidence that its prosecution was not diligent. *See Atlantic States Legal Found. v. Universal Tool & Stamping Co.*, 735 F.Supp. at 1416; *Love v. New York State Dep't of Envtl. Conservation*, 529 F.Supp. at 844; *Sierra Club v. SCM Corp.*, 572 F.Supp. 828, 831 n. 3 (W.D.N.Y. 1983). The court determines that these deficiencies alleged by the Plaintiffs are not, in

and of themselves, dispositive of the issue of diligent prosecution. However, when viewed in light of all of the circumstances surrounding DHEC's settlement with Laidlaw, these factors also weigh in favor of allowing the Plaintiffs' lawsuit to proceed.

 The Plaintiffs' strongest challenge to DHEC's diligence in prosecuting Laidlaw relates to the amount of the penalty imposed for Laidlaw's NPDES violations. A lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution. *Atlantic States Legal Found. v. Universal Tool & Stamping Co.,* 735 F.Supp. at 1416. As the Plaintiffs observe, the penalty obtained by DHEC was far less than the maximum possible penalty. According to the Fact Sheet accompanying DHEC's May 21, 1992 Notice of Enforcement Conference, the DHEC lawsuit concerned 227 permit violations between April 1991 and March 1992. Def.Ex. 159. Since the maximum penalty under the South Carolina Pollution Control Act is $10,000 per day of violation, S.C.Code Ann. § 48–1–330 (Law.Co-op.1987), DHEC could have sought a penalty from the Defendant as high as $2,270,000. As noted above in the findings of fact, however, DHEC's initial penalty request was only $120,000, and DHEC and the Defendant ultimately agreed to a penalty of only $100,000. Furthermore, the Consent Order purports to cover all of the Defendant's violations of its permit, even though the DHEC Notice of Enforcement Conference does not list many of the violations alleged in the Plaintiffs' complaint.

The Plaintiffs' most persuasive argument that DHEC's lawsuit against Laidlaw was not diligent prosecution is that in imposing the civil penalty of $100,000 against Laidlaw, DHEC failed to recover, or even to calculate, the economic benefit that Laidlaw received by not complying with its permit. Economic

benefit refers to the amount of money that Laidlaw allegedly saved by delaying the purchase, installation, and maintenance of equipment necessary to comply with its NPDES permit in a timely fashion.

 The civil penalty provisions in the CWA are intended to reduce pollution of the nation's waterways by deterring persons from violating the requirements of the Act. *See Hawaii's Thousand Friends v. City & County of Honolulu,* 821 F.Supp. 1368, 1394 (D.Haw.1993) (citing *Tull v. United States,* 481 U.S. 412, 422–23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987)). A penalty serves as a successful deterrent only if potential violators believe that they will be worse off by not complying with the applicable requirements.[15] *See Atlantic States Legal Found. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1141 (11th Cir.1990) ("Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations."); *United States v. Roll Coater, Inc.,* 21 Envtl.L.Rep. (Envtl.L.Inst.) 21073, 21075, 1991 WL 165771 (S.D.Ind.1991) ("[U]nless the [defendant] company is fined an amount at least as great as the economic gain in not complying with the regulations, the statute serves little deterrent value."). The court in *PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158 (D.N.J.1989), *aff'd in part, rev'd in part,* 913 F.2d 64 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991), explained well the purposes behind civil penalties:

Civil penalties seek to deter pollution by discouraging future violations. To serve this function, the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty

---

15. Courts have recognized this principle in contexts other than the Clean Water Act. *See, e.g., United States v. A.A. Mactal Constr. Co.,* 22 Envtl. L.Rep. (Envtl.L.Inst.) 21200, 21201, 1992 WL 245690 (D.Kan.1992) (in determining penalty under the Clean Air Act, stating that "unless the violator is fined an amount at least as great as the economic gain it enjoyed in not complying with the regulations, the statute serves little deterrent value"; and finding that "the recovery economic benefit is essential and that economic

benefit should serve as the floor below which the maximum civil penalty should not be mitigated"); *cf. United States v. ITT Continental Baking Co.,* 420 U.S. 223, 231, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975) (in case under the Federal Trade Commission Act, stating that "Congress was concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators of FTC orders as nothing more than an acceptable cost of violation, rather than as a deterrence to violations.").

as a cost of doing business. Otherwise, a rational profit maximizing company will choose to pay the penalty rather than incur compliance costs. Additionally, the probability that a penalty will be imposed must be high enough so that polluters will not choose to accept the risk that non-compliance will go unpunished.

*Id.* at 1166 (citations omitted). Similarly, only by removing the economic benefit of noncompliance can a civil penalty ensure that a violator receives no economic advantage *vis-à-vis* its competitors who comply in a timely fashion with all environmental regulations. *PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d at 80 (quoting S.Rep. No. 50, 99th Cong., 1st Sess. 25 (1985)).

Actually, to serve as an effective deterrent, a civil penalty must recover an amount beyond the economic benefit of noncompliance. If a penalty recovered merely required the polluter to disgorge the benefit it received from noncompliance, then from a purely economic standpoint, a discharger would be indifferent between spending the money necessary to achieve full compliance in a timely manner and ignoring the regulation and simply paying the civil penalty as a cost of doing business.[16] *See SPIRG v. Monsanto Co.*, 29 Env't Rep. Cas. (BNA) 1078, 1090, 1988 WL 156691 (D.N.J.1988) ("To simply equalize the economic benefit with the penalty would serve ill the possibility of discouraging other and future violations. Some additional penalty should be imposed as a sanction.").

Removing a violator's economic benefit is central to the enforcement provisions of the CWA. The civil penalty provision in section 309(d) of the CWA, 33 U.S.C. § 1319(d), requires that the violator's economic benefit be considered in imposing civil penalties. Section 309(d) provides, in part:

> Any person who violates . . . any permit . . . issued under section 1342 of this title by the Administrator, or by a State . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court *shall* consider the seriousness of the violation or violations, *the economic benefit (if any) resulting from the violation,* any history of such violation, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d) (emphasis added).

Congress amended section 309(d) of the CWA in 1987 to add the list of factors, including economic benefit, that courts must consider in determining civil penalties. Water Quality Act of 1987, Pub.L. No. 100–4, sec. 313(c), § 309(d), 101 Stat. 7, 45 (codified at 33 U.S.C. § 1319(d)). Prior to 1987, section 309(d) provided for the imposition of civil penalties, but did not specifically list the factors that should be considered in determining the appropriate amount of the penalty. When Congress added these required factors, it adopted the factors that EPA had included in its policy guidelines for assessing penalties under the CWA. *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d at 1142 n. 23 ("It appears that Congress took note of the factors listed in the [EPA's penal-

---

**16.** Of course, this analysis is somewhat imperfect because it assumes that all violators will be assessed an appropriate civil penalty—*i.e.*, 100% enforcement. In reality, a violator's expected punishment would be reduced by a certain percentage to represent the proportion of violations that are either never prosecuted or not successfully prosecuted. The reality of imperfect enforcement suggests that civil penalties beyond the amount of the violator's economic benefit should be imposed so that dischargers do not simply gamble that they will not be caught. *See* Michael Levinson, Note, *Deterring Air Polluters Through Economically Efficient Sanctions: A Proposal for Amending the Clean Air Act,* 32 Stan. L.Rev. 807, 812–13 (1980):

> A firm deciding to violate . . . faces an "expected fine" equal to the potential fine discounted

by the probability of detection and assessment. . . . In deciding whether to comply, the firm will balance against this cost the benefits that it expects to reap from noncompliance.

> Under the economic theory of deterrence, the "optimal"—most efficient and effective— economic deterrent is the fine that when discounted by the probability of detection just equal the economic value of noncompliance.

(footnotes omitted).

This analysis also does not account for attorneys' fees or other costs necessary to defend against enforcement actions; nor does the analysis address a polluter's loss of good will, or the stigma that attaches to a company that is fined for violating environmental laws.

ty] policy when it amended 33 U.S.C. § 1319(d) to require courts to take account of certain specified factors when determining civil penalty awards.").

Under the EPA's 1978 penalty policy, removal of the violator's economic benefit derived from noncompliance was one of four factors to be considered in determining the amount of the penalty to be imposed. EPA, Civil Penalty Policy for Major Source Violators of Clean Air Act and Clean Water Act (Apr. 11, 1978), *reprinted in* Env't Rep. (BNA), Federal Laws 41:1101, 41:1104 (Apr. 27, 1979) (Pl.Ex. 106). The 1978 policy stated that removing the violator's economic benefit "will assure that violators of the law do not economically benefit from their violation [and] ... will assure that violators do not gain an economic advantage over others who incurred costs to obey the law." *Id.* at 41:1102.

Subsequent EPA penalty policies retained and reinforced the emphasis on the removal of the economic benefit of noncompliance. For example, the 1984 penalty policy provides that "it is Agency policy that penalties generally should, at a minimum, remove any significant economic benefits resulting from failure to comply with the law." Policy on Civil Penalties, EPA General Enforcement Policy # GM–21, at 3 (Feb. 16, 1984) (Pl.Ex. 108). Also, the 1986 penalty policy provides that "penalties should, at a minimum, recover the economic benefit of noncompliance," EPA's Clean Water Act Penalty Policy for Civil Settlement Negotiations 1 (Feb. 11, 1986), *reprinted in* 1 Env't Rep. (BNA), Federal Laws 21:911 (Pl.Ex. 109); and that "every reasonable effort shall be made to calculate and recover the economic benefit of noncompliance." *Id.* at 3. The 1986 penalty policy requires that economic benefit be recovered in a settlement of a judicial action, except in "a limited number of cases" where the settlement amount may be reduced below the economic benefit "based upon a defendant's inability to pay or 'litigation practicalities.'" [17] *Id.*

As the Supreme Court has recognized, the "view of the agency charged with administering the statute is entitled to considerable deference." *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985). Therefore, the EPA's policy that civil penalties must recover at least the amount of the violator's economic benefit of noncompliance suggests that a state enforcement agency's failure to do so is some evidence that the agency's prosecution was not diligent.

The NPDES Enforcement Agreement entered into between South Carolina and the EPA further demonstrates the importance of recovering economic benefit when the state assesses civil penalties. This agreement requires "the assessment of a civil penalty, when appropriate, based on consideration of established factors (or equivalent sanctions) as part of all civil judicial referrals." NPDES Enforcement Agreement—FY 92 Between the State of South Carolina and EPA, Region IV, at 13 (Apr. 28, 1992) (Pl.Ex. 111). The established factors are listed in a footnote and include "the amount of economic benefit resulting from the violation." *Id.* at 13 n. *.

Moreover, DHEC's Uniform Enforcement Policy, which governs the agency's environmental enforcement procedures, states that the guidelines for civil penalty assessment are intended, *inter alia,* to "punish and deter future violations" and "to eliminate economic incentives for noncompliance." DHEC, Uniform Enforcement Policy, sec. III, ¶ 2 (Dec. 12, 1991) (Pl.Ex. 10). The guidelines provide that in assessing a penalty, DHEC may consider "any one or combination of the following factors:"

 (a) Degree of harm or potential harm to the public health, safety, or environment;

 (b) Extent of deviation from the requirements of the statute, regulation, standard or permit;

---

17. Litigation practicalities include such factors as "the probability of proving questionable violations, the probability of acceptance of an untested legal construction," and equitable considerations, such as whether the defendant "reasonably, conclusively, and detrimentally" relied on EPA's representations or actions. *Id.* at 6. The Defendant has not contended that any of these factors were present in its settlement with DHEC.

(c) Frequency or duration of the violation. This may include multiple or multi-day violations;

(d) Economic benefit as a result of non-compliance. This may include any evidence of economic advantage gained through noncompliance. In calculating economic benefit, enforcement staff may utilize the EPA computer model as appropriate;

(e) Cost of restoration of the environment or abatement of the environmental harm;

(f) Past performance record or past history of violations;

(g) Degree of willfulness and/or negligence;

(h) Other pertinent factors that measure the seriousness or frequency of the violation or the conduct of the party.

*Id.* at 6.

Although neither DHEC's NPDES Enforcement Agreement with the EPA nor DHEC's Uniform Enforcement Policy explicitly requires DHEC to calculate economic benefit in every case, both documents illustrate the importance of considering economic benefit when imposing civil penalties.

The Defendant vigorously argues that the alleged failure of DHEC's civil penalty to recover economic benefit does not evidence a lack of diligent prosecution. The Defendant concedes that the CWA requires the consideration of economic benefit when civil penalties are assessed in the following three circumstances: (1) an administrative enforcement action by the Administrator pursuant to section 309(g) [18]; (2) a judicial action in federal court by the Administrator pursuant to section 309(b) [19]; and (3) a citizen suit in federal court under section 505(a) that is not barred by the diligent prosecution limitation in section 505(b)(1)(B).[20] However, the Defendant asserts that nothing in the CWA requires a state agency, such as DHEC, which is delegated the authority under section 402(b) to administer the state's own NPDES program, to calculate a violator's economic benefit of noncompliance in a state judicial or administrative enforcement action.

The Defendant's argument misconstrues the nature of the precise issue presently before the court. The issue is not whether the Act explicitly *requires* the state enforcement agency to do anything; rather the issue is whether the state's failure to calculate economic benefit is evidence of non-diligent prosecution so that the citizen suit can proceed under section 505(b)(1)(B). The court agrees that no language in the CWA directly requires a state enforcement agency to calculate economic benefit when determining what an appropriate civil penalty should be. In other words, the CWA does not require states to replicate federal standards or procedures for assessing penalties under the state's water pollution control laws. However, if a state's enforcement mechanisms fail to meet the standard for diligent prosecution under section 505(b)(1)(B), then the state's action would not preclude a subsequent citizen suit under section 505(a) of the Act.

The Defendant also asserts that the diligence of DHEC's prosecution is demonstrated by the fact that the EPA did not overfile [21] in this case, nor has the EPA ever overfiled in a case in South Carolina where DHEC did not calculate economic benefit. This argument is fallacious, however, because

---

**18.** Section 309(g)(3) provides that "[i]n determining the amount of any penalty assessed under this subsection, the Administrator ... *shall* take into account [*inter alia*] economic benefit or savings (if any) resulting from the violation," 33 U.S.C. § 1319(g))(3).

**19.** Such action would be governed by section 309(d) discussed above. 33 U.S.C. § 1319(d).

**20.** Section 505(a) provides that "[t]he district court shall have jurisdiction ... to apply any appropriate civil penalties under section 309(d) of this title." 33 U.S.C. § 1365(a).

**21.** Under the Act, the EPA retains authority to enforce permits in states that administer their own delegated or approved NPDES programs. *See* 33 U.S.C. § 1342(i). Although a state has the primary responsibility for enforcing permits under its own program, the EPA may take action "principally where [the] State is 'unwilling or unable' to take 'timely and appropriate' enforcement action." EPA, Policy Framework for State/EPA Enforcement Agreements 21 (Aug. 1986). The term "overfiling" refers to the EPA's filing a federal enforcement action against a defendant that has been previously sued by a state for the same type of violations.

the standard for when the EPA overfiles in a state enforcement action is not the same as the "diligent prosecution" standard under section 505(b)(1)(B) below which a citizen suit may proceed.

The regulations governing state NPDES programs provide, "A civil penalty assessed, sought, or agreed upon by the State Director under paragraph (a)(3) of this section shall be appropriate to the violation." 40 C.F.R. § 123.27(c). The note accompanying this particular subsection provides that "[t]o the extent that State judgments or settlements provide penalties in amounts which EPA believes to be substantially inadequate in comparison to the amounts which EPA would require under similar facts, EPA, when authorized by the applicable statute, may commence separate actions for penalties." *Id.*, Note. Whether the amount of a state's penalty is "substantially inadequate" is not, however, the same inquiry as whether the state diligently prosecuted the violator for purposes of section 505(b)(1)(B).

Also, the EPA's decision not to file a separate action to recover additional penalties does not indicate that the penalty was adequate or that the state's prosecution was diligent. The CWA does not require the EPA to overfile a state enforcement action whenever the state assesses "substantially inadequate" civil penalties; rather, the Act gives the EPA the discretion to overfile in such cases. If the diligence of a state agency's prosecution in a particular case were established by the fact the EPA did not elect to overfile in that case, then the citizen suit provisions of the CWA would be rendered meaningless. Under the Defendant's theory, a citizen could never bring a private enforcement suit that challenged the adequacy of a state prosecution: If the EPA did not overfile, the citizen would be barred by the diligent prosecution standard of section 505(b)(1)(B); and if the EPA did overfile, there would presumably be no need for the citizen to bring a private action. Clearly Congress did not intend for the EPA's oversight authority to subsume the oversight authority given to private citizens through the citizen suit provisions of the Act.

The primary purpose of citizen suits is to allow private persons to take action to enforce the law when the EPA or the state, or both, have failed to do so adequately. *See* S.Rep. No. 414, *supra*, at 80, *reprinted in* 1972 U.S.C.C.A.N. at 3746 ("[I]f the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action."); 118 Cong.Rec. 33,716 (Oct. 4, 1972) (statement of Sen. Bayh), *reprinted in* Senate Comm. of Public Works, 93d Cong., 1st Sess., *Legislative History of the Water Pollution Control Act Amendments of 1972*, at 217 (Comm.Print 1973) [hereinafter *"CWA Legislative History"*] ("Citizen suits ... can be a very important tool for keeping industry and Government alike from letting standards and enforcement slip."). As the Department of Justice states in its brief as *amicus curiae*, "Inaction by the state or federal government is not a justification for dismissing a citizen suit; instead, it is the principal justification for allowing such a suit to go forward."

 The Defendant next argues that the EPA has tacitly sanctioned DHEC's failure to consider economic benefit when assessing civil penalties, because EPA has not withdrawn the state's authority to operate its own NPDES program. This argument is also fallacious because the criteria for withdrawing a state's authority to administer its own NPDES program are not the same as the criteria for allowing citizens under section 505(b)(1)(B) to "overfile" a state enforcement proceeding. Withdrawal of a state's authority to administer its NPDES program is a drastic remedy that the EPA would not, and should not, undertake lightly. *See* 118 Cong.Rec. 10,241 (Mar. 27, 1982) (Statement of Rep. Reuss), *reprinted in CWA Legislative History, supra*, at 452 ("[A] total takeover [by the EPA of a state NPDES program] would result in chaos both at the State and Federal level. It should be exercised only when there is clear evidence that the entire State program has fallen into disrepair."); *see also Sierra Club v. SCM Corp*, 572 F.Supp. 828, 830 n. 1 (W.D.N.Y.1983) (rejecting defendant's argument that the citizen "plaintiffs' exclusive remedy for the apparent lack of public participation in the

[state agency's] administrative proceedings is to petition the Federal Government to withdraw its approval of the New York State enforcement program for failure to comply with the Federal Requirements and Standards").

■ During the hearing on this matter, as well as in its briefs submitted in this case, the Defendant repeatedly remarked that the 1.3 ppb mercury limit was overly stringent and that the Defendant, at all times, proceeded reasonably and in good faith in attempting to comply with the limit. These arguments do not, however, require the court to dismiss the Plaintiffs' citizen suit.

This court is not the appropriate forum for the Defendant to challenge the propriety of the effluent limits in its NPDES permit. The Defendant's attack on its permit's mercury limit should be, or should have been, raised in a direct appeal of the permit or in a request for a site-specific variance from the permit; it should not be raised in this action.

■ In addition, under the Clean Water Act a violation of an NPDES permit is a strict liability offense. *E.g., Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir.1986); *PIRG v. Elf Atochem North America, Inc.,* 817

F.Supp. 1164, 1178 (D.N.J.1993); *United States v. CPS Chem. Co.,* 779 F.Supp. 437, 442 (E.D.Ark.1991). Thus, the reasonableness or *bona fides* of an alleged violator's efforts to comply with its permit is not relevant in determining whether a violator is liable under the Act. *See United States v. Ohio Edison Co.,* 725 F.Supp. 928, 934 (N.D.Ohio 1989).[22]

■ At the hearing, the Defendant also argued that the amount of the fine imposed against Laidlaw is itself evidence of diligent prosecution because it was the third or fourth most severe penalty for a water pollution violation in DHEC history. This argument is also unavailing because the history of civil penalties imposed by DHEC is irrelevant to the issues presently before the court. If DHEC's method for calculating civil penalties is inadequate because it does not ensure the recovery of the violator's economic benefit, then a comparison to past DHEC penalties certainly cannot show diligence.[23]

Finally, the Defendant argues that this court should not require DHEC to calculate economic benefit in every case because the agency simply does not have the resources to make such calculations. However, this argument actually *supports* rather than rebuts

---

**22.** Of course, a violator's good-faith efforts to comply with the applicable requirements may be considered as a factor in determining the appropriate amount of a civil penalty. 33 U.S.C. § 1319(d).

**23.** The Defendant further argued that DHEC's diligence is demonstrated by the fact that DHEC's average penalty for an NPDES violation is one of the highest averages among the state agencies in the southeastern United States that operate their own NPDES programs. The Defendant stated that if DHEC's enforcement efforts were any more diligent, or more stringent, then industry would leave South Carolina in favor of other states with more relaxed environmental enforcement.

This is an improper argument to make before this court. The court's sworn duty is to apply the laws as written by Congress.

The legislative history of the Clean Water Act indicates that the drafters of the Act debated the potential problem that some states might loosen their environmental standards to attract industry and jobs. However, the solution to such a problem is uniform federal enforcement of the Act. *See* 118 Cong.Rec. 10,241 (Mar. 27, 1972) (state-

ment of Rep. Reuss), *reprinted in CWA Legislative History, supra,* at 452:

"[T]he greatest political barrier to effective pollution control ... is the threat of our worst polluters to move their factories out of any State that seriously tries to protect its environment. It is the practice of playing off one State against the other. It is the false but strident cry of the polluter that clean air and clean water mean fewer jobs.

. . . .

... [T]he answer to threats is uniformity. The only way to stop polluters from political intimidation is to prevent them from raising the alternative of moving to a place where pollution is allowed. There should be no such place in this country. We can no longer tolerate the fact that the price of diligence is intimidation. We should have uniform standards of pollution control in all fifty States—tough standards, fair standards, a set of meaningful and comprehensive rules that permit neither exception nor evasion. Pollution does not stop at State boundaries and neither must its regulation."

(quoting testimony of then Governor Wendell R. Anderson of Minnesota before the House· Public Works Committee (Dec. 9, 1971)).

the Plaintiffs' argument that DHEC's failure to recover economic benefit demonstrates the agency's lack of diligent prosecution against Laidlaw. If a state agency does not have the resources to adequately enforce permits under its NPDES program by ensuring that violators of the permits do not benefit from noncompliance, then private citizens should be able to assist enforcement efforts by bringing a citizen suit. As the Eighth Circuit has recognized, "agency inaction is precisely the circumstance in which private action is appropriate." *United States EPA v. City of Green Forest, Ark.*, 921 F.2d 1394, 1405 (8th Cir.1990), *cert. denied*, 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991) (citing *SPIRG v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1427 (D.N.J.1985) ("Defendant's interpretation of the Act would render citizen suits impossible when they are required most: instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.")).

Furthermore, were this court to rule that DHEC's failure to consider Laidlaw's economic benefit of noncompliance is evidence of non-diligent prosecution, the court would not be requiring DHEC to calculate economic benefit in future enforcement actions. If DHEC continues not to perform such a calculation in assessing civil penalties, however, a judicial enforcement action by DHEC might not be considered diligent under section 505(b)(1)(B) so as to preclude a citizen suit. In making such a conclusion, the court would not be condemning or invalidating the state's enforcement procedures; rather, the court would merely be allowing the citizen suit to supplement the state's enforcement efforts—exactly what Congress envisioned the role of the citizen suit to be.

Accordingly, the court determines that because recoupment of a violator's economic benefit of noncompliance is central to the enforcement of the CWA, the failure of the state enforcement agency to recover, or even to determine, a violator's economic benefit is strong evidence that the agency's pros-

ecution of that violator was not diligent for purposes of section 505(b)(1)(B) of the CWA.

The determination of economic benefit is susceptible to several different methods of calculation. As the Third Circuit Court of Appeals observed, "Precise economic benefit to a polluter may be difficult to prove. The Senate Report accompanying the 1987 amendment that added the economic benefit factor to section 309(d) recognized that a reasonable approximation of economic benefit is sufficient to meet the plaintiff's burden on this factor." *PIRG v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 80 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Specifically, the Senate Report provides that "[t]he determination of economic benefit or other factors will not require an elaborate or burdensome evidentiary showing. Reasonable approximations of economic benefit will suffice." S.Rep. No. 50, 99th Cong., 1st Sess. 25 (1985).

The court determines that the methodology suggested by Dr. Kavanaugh—the capital-asset pricing model—is a reasonable method of calculating the Defendant's economic benefit of noncompliance. *See Atlantic States Legal Found. v. Universal Tool & Stamping Co.*, 786 F.Supp. 743, 751 (N.D.Ind.1992) (using defendant's average return on equity of 16.1% to calculate the economic benefit of delayed installation of equipment for four years). An equity rate, such as that employed by the capital-asset pricing model, provides the best approximation of the return the violator could have earned by delaying or avoiding expenses that are necessary for compliance with its permit.

As noted earlier, the court declines, in this order, to make a specific finding on the precise amount of the Defendant's economic benefit of noncompliance.[24] For purposes of the matter presently before the court, however, the court finds that the economic benefit substantially exceeds the $100,000 fine imposed by DHEC and that DHEC's penalty

24. Of course, if the Plaintiffs ultimately succeed on the merits of their citizen suit, the court is required by sections 505(a) and 309(d) of the Act to include a calculation of economic benefit, as well as the other statutory factors, in assessing an appropriate civil penalty. 33 U.S.C. § 1365(a).

therefore failed to recover the Defendant's economic benefit of noncompliance.

## IV. CONCLUSION

For all of the foregoing reasons, the court concludes that DHEC's lawsuit against Laidlaw, which was filed in South Carolina state court on June 9, 1992 and settled by consent order on June 10, 1992, does not constitute diligent prosecution under section 505(b)(1)(B) of the Clean Water Act. Therefore, the Plaintiffs' citizen suit, which was filed on June 12, 1992, is not barred by the state agency's prior judicial enforcement action.

The court's conclusion that DHEC's action against Laidlaw was not "diligent prosecution" as that term is used in section 505(b)(1)(B) of the Act is not intended, nor should it be interpreted, to cast any aspersions on DHEC's enforcement personnel. The court recognizes that DHEC is responsible for monitoring many aspects of the health and welfare of the citizens of South Carolina and that the agency must fulfill its duties with limited resources. The citizen suit provision of the Clean Water Act, like similar provisions in other environmental statutes, is intended to allow private citizens to supplement enforcement efforts whenever the governmental agencies, because of a lack of resources or some other reason, cannot or do not adequately enforce environmental standards.

The effect of the court's present ruling is merely to allow the Plaintiffs' citizen suit to proceed beyond the threshold limitation of section 505(b)(1)(B). This order does not address the merits of the Plaintiffs' action.

The court will issue a separate scheduling order, contemporaneously with this order, to establish a deadline for substantive motions and a trial date for the remaining issues in the case.

IT IS SO ORDERED.

1. In its order of June 5, 1995, the court granted three parties leave to file briefs as *amicus curiae* in support of the Defendant's motion for reconsideration, or in the alternative for certification under Section 1292(b). The *amici* parties are

## ORDER ON MOTION FOR RECONSIDERATION

The Defendant has moved the court to reconsider its April 7, 1995 order, or in the alternative to certify the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That order allowed this citizen suit brought pursuant to Section 505 of the Federal Water Pollution Control Act amendments of 1972, commonly known as the Clean Water Act, 33 U.S.C. § 1365, to proceed to trial. The April 7 order rejected the Defendant's contention that this action is barred by Section 505(b)(1)(B) of the Act, 33 U.S.C. § 1365(b)(1)(B), because the South Carolina Department of Health and Environmental Control ("DHEC") had previously brought, and settled, a law suit against Laidlaw for the same alleged violations of its discharge permit. The court agreed with the Plaintiffs that DHEC did not "diligently prosecute" its action against Laidlaw and that this proceeding is, therefore, not barred under Section 505(b)(1)(B).

In their briefs and their arguments to the court, the Defendant and three *amici curiae* [1] have suggested that the court's finding of non-diligent prosecution turned entirely upon the fact that DHEC did not recoup a penalty at least equal to the Defendant's economic benefit of non-compliance. In its memorandum, Laidlaw contends that this court's order "hinges" on the economic benefit issue; the South Carolina Industrial Waste Management Association suggests that the economic benefit consideration was the "gravamen" of the court's order; and the South Carolina Chamber of Commerce and South Carolina Textile Manufacturers Association argued that the court "held" that because DHEC did not determine the economic benefit of non-compliance with the permit in assessing the $100,000 penalty against Laidlaw, its enforcement action was not diligent under the Clean Water Act.

These arguments overstate the significance of the economic benefit analysis to the court's

the South Carolina Chamber of Commerce, the South Carolina Textile Manufacturers Association, and the South Carolina Industrial Waste Management Association.

decision. Read broadly, these objections imply that the court has held that DHEC must calculate and recover the economic benefit of non-compliance each time DHEC imposes a penalty for a permit violation. In this case, the failure of DHEC to calculate, or even consider, the economic benefit of non-compliance with the permit in question was *evidence* of non-diligent prosecution in the judicial enforcement action. However, the court did not hold that this factor, standing alone, would always support a finding of non-diligent prosecution.

In sum, the court's April 7 order held that on the peculiar facts presented in this litigation, the DHEC enforcement action was not diligently prosecuted. The economic benefit issue was a factor, but was by no means the only factor, upon which the decision rests.

The court has carefully considered all of the arguments asserted by the Defendant and the *amici curiae* in their memoranda and other submissions to the court and finds no basis for disturbing its earlier order. Accordingly, the motion to reconsider must be denied.

The Defendant's alternative motion is for the court to certify its April 7, 1995 order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Although courts of appeals generally have jurisdiction only over final decrees, section 1292(b) provides a court of appeals discretion to hear an interlocutory appeal of an order if the district court certifies "that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The court declines the Defendant's request to certify for interlocutory appeal its earlier ruling in this action. It is well settled that piece-meal appeals are not favored in the law, and that certification under section 1292(b) is an extraordinary measure. *See Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). Interlocutory appeal would be especially inappropriate in this case because the remaining issues have been narrowed, and counsel estimates that the trial

on these issues should take no more than three or four days. Moreover, the trial is currently scheduled for July 31, 1995. Given the procedural posture of this action, the court cannot say that an interlocutory appeal would materially advance the termination of this litigation. Accordingly, the Defendant's motion for certification under 28 U.S.C. § 1292(b) is denied.

IT IS SO ORDERED.